**UNITED STATES of America**

v.

**Amir PORAT, Appellant in 93–1095 and 93–1242.**

**UNITED STATES of America, Appellant in 93–1176 and 93–1243,**

v.

**Amir PORAT.**

Nos. 93–1095, 93–1176, 93–1242 and 93–1243.

United States Court of Appeals, Third Circuit.

Argued Dec. 14, 1993.

Decided March 3, 1994.

Sur Petition For Rehearing April 14, 1994.

---

Anne K. Bingaman, Asst. Atty. Gen., John J. Powers, III, Andrea Limmer (Argued), U.S. Dept. of Justice, Washington, DC, Antonia R. Hill, Willard S. Smith, U.S. Dept. of Justice Antitrust Division, Philadelphia, PA, for U.S.

Theodore Simon (Argued), Philadelphia, PA, for Porat.

Before: SLOVITER, Chief Judge, GREENBERG and ROTH, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge:

On March 3, 1992, a grand jury sitting in the Eastern District of Pennsylvania indicted Amir Porat on two counts of making material false declarations before a 1989 grand jury investigating antitrust violations between Porat's company, IM, Inc. (IM), and Fraass Survival Systems, Inc. (Fraass).

Count One charged that Porat made a false statement when he denied receiving a $200,000 check issued by Fraass to Credit Suisse, a bank located in Switzerland. Count Two charged that Porat made a false state-

ment when he denied ever having a personal bank account in Switzerland.

Following a one week trial in December 1992, a jury convicted Porat on Count Two but was unable to reach a verdict on Count One. The district court declared a mistrial as to the first count and imposed a sentence on Count Two of five months' imprisonment followed by five months' supervised release, conditioned on home detention in Israel, and a $10,000 fine. Porat filed an appeal to this Court raising a number of issues relating to his trial. The government cross-appealed, objecting to the terms of Porat's sentence.

After reviewing the record, we uphold Porat's conviction.[1] On cross-appeal, the government asserts that the district court erred in failing to adjust Porat's base offense level upward by two levels pursuant to Sentencing Guidelines § 3C1.1 for obstruction of justice. Second, the government asserts that the district court lacked authority to permit Porat to serve five months of his sentence in home detention in Israel. We disagree with the government's first contention. We agree, however, with the government's second contention and will therefore vacate the home detention portion of the district court's judgment of sentence and remand for resentencing.

## I.

Amir Porat is an Israeli national who moved to New Jersey in the early 1980s to establish IM, a medical supply company.[2] Prior to this time, Amir and his brother, Michael Porat, owned and operated H.G. Pollack, Ltd. (Pollack), which manufactured medical supplies in Israel. Amir Porat continued to have an interest in Pollack after his move to this country. At the time of IM's entry into the American market in the early 1980s, only a few companies bid on Department of Defense (DoD) contracts to supply certain types of military bandages. The major supplier was Fraass, headquartered in New York and owned and operated by Colin Offenhartz.

1. In his brief and in oral argument Porat raised a number of issues on appeal. We have reviewed each, and do not find Porat's arguments persuasive. The following is a list of the assertions raised by Porat:

(1) Whether the government failed to prove the "materiality" element of 18 U.S.C. § 1623 by failure to prove either the scope of the grand jury investigation or how the testimony may have impeded the grand jury's investigation.
(2) Whether the evidence was insufficient pursuant to Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), where the answers were literally true but unresponsive.
(3) Whether, in order to comply with due process, the element of "materiality" must be submitted to the jury for proof beyond a reasonable doubt.
(4) Whether the defendant was denied a fair trial when he was precluded from presenting important material and relevant evidence at trial, including: testimony from his case investigator; evidence of his good character; effective cross-examination of the government's chief accuser; and the opportunity to refute improper other crimes evidence.
(5) Whether the defendant was denied a fair trial when irrelevant, overly prejudicial and inadmissible evidence in the nature of antitrust violations was admitted and further where such evidence was based on other inadmissible and unreliable hearsay evidence.
(6) Whether the admission of prior inconsistent evidence was reversible error.

(7) Whether the government improperly "vouched" for witnesses.
(8) Whether the defendant's right to close to the jury was violated and was he unfairly impugned before the jury.
(9) Whether the government committed reversible error in its closing statement to the jury.
(10) Whether the government failed to disclose false testimony or substantially misleading testimony of their chief witness.
(11) Whether the government violated the defendant's rights including his due process rights by the impermissible use of the United States and Switzerland Mutual Legal Assistance Treaty in combination with a "perjury trap."
(12) Whether there was unconstitutional pre-accusation delay.
(13) Whether the district court should have recognized that it had the authority, when presented with facts and circumstances not considered by the Sentencing Commission, to sentence below the guidelines.

In consideration of these issues on appeal, we have reviewed the defendant's brief, the trial transcript, the sentencing transcript, and all additional information filed with this Court. After a thorough review, we do not believe that the district court committed any evidentiary, constitutional, or other error that would provide for the relief that the defendant claims.

2. Since the mid–1980s, Porat has maintained his primary residence in Israel, although he continues to own a home in New Jersey. Porat voluntarily returned to the United States to stand trial.

At trial, the government proved that Porat made a false material statement to the 1989 grand jury, in part by showing as background to the false statement that Offenhartz and Porat had allegedly conspired to rig bids on DoD contracts. Although Porat was a target of the 1989 grand jury investigation into alleged bid-rigging, no indictment was ever brought against him on antitrust violations.[3]

As background evidence in support of its case, the government showed that Porat and Offenhartz agreed that Fraass would bid high on military contracts in which Pollack had established a market presence (Israel and other foreign markets), and Pollack would reciprocate by bidding high on federal government contracts or not bidding at all. According to government witnesses, this alleged agreement continued after IM entered the United States market for military bandage contracts awarded by DoD.

In 1984, the Israeli government contacted Fraass and solicited a bid for military bandages. The funds to pay for this contract were loans from the federal government to Israel. Israel, in turn, was required to use an American manufacturer. Deeming IM to be fundamentally connected to Pollack, the Israeli government would not accept IM's participation in the contract. Fraass agreed to supply Israel with 500,000 bandages but at a price that exceeded the bids submitted to the DoD. According to Offenhartz's testimony, he contacted Porat, and they agreed that Porat would receive 40 cents on each bandage, or $200,000. Offenhartz testified that he made this payment to maintain the goodwill between the two companies, so that IM would continue to bid high on DoD contracts. Offenhartz testified to the 1989 grand jury and at Porat's trial that he gave Porat the check for $200,000 in person, after Porat asked that the check be made out to a Swiss bank account.

Porat voluntarily testified before the 1989 grand jury after being notified that he was a target of the investigation. He denied all knowledge of the check and denied that he maintained a Swiss bank account, into which the alleged check was deposited. The grand jury continued its investigation beyond Porat's appearance but did not bring an indictment against him for antitrust violations.

In March 1992, a second grand jury brought a two-count indictment stemming from Porat's testimony to the 1989 grand jury. Count One charged that Porat made a material false statement when he denied receiving a $200,000 check issued by Fraass to Credit Suisse, a Swiss bank. Count Two charged that Porat made a material false statement when he denied ever having a personal Swiss bank account.

At trial, the government sought to prove the material false statements with evidence that Porat had opened three bank accounts in Switzerland. The government submitted evidence of Swiss bank records which indicated that Porat traveled to Switzerland to open bank accounts on three occasions.[4] The bank records contain two identification numbers from Porat's passport along with Porat's signature. Among the evidence offered by the government was a copy of Porat's passport, which was provided to the government by Porat's counsel, and testimony of a handwriting expert who had analyzed Porat's writing. The handwriting expert testified that the signatures on the Swiss bank records were Porat's. This testimony was based on the Credit Suisse bank documents, court records and affidavits containing Porat's signature, a United States customs declaration and fingerprint cards signed by Porat, and exemplars provided by Porat in a

---

3. Offenhartz and Fraass Survival Systems, Inc. were convicted of bid-rigging in 1988. Offenhartz was sentenced to five years in prison and Offenhartz and Fraass received a combined fine of $1,000,000. After sentencing, Offenhartz and Fraass pled guilty to an additional charge of bid-rigging. Along with a further fine and forfeiture, one condition of that agreement was that Offenhartz cooperate with the government in other investigations.

4. The government presented evidence that bank accounts were opened by Porat at Credit Suisse on: (1) October 8, 1984; (2) May 13, 1987; and (3) April 6, 1989. The evidence demonstrated that the first two accounts were opened using Porat's 1984 passport, while the third account was opened using a passport issued to Porat in 1988. The first account was closed on the same day that the second account was opened. The latter two accounts were closed in May, 1990.

session with an agent of the Defense Criminal Investigative Service.

Porat, acting pro se, did not testify, but he did present a substantially different version of events. Porat presented evidence that IM and Fraass were fierce competitors and that Offenhartz had paid Porat's brother, Michael Porat, the $200,000 for Michael's help in Fraass' contract with Israel. Porat's defense centered on the theory that Michael Porat established the Swiss bank account under Amir Porat's name. Porat presented evidence that he frequently signed financial documents for Pollack in Israel without reading them; thus Michael Porat was able to open a Swiss bank account without Amir Porat's knowledge. Finally, Porat presented testimony that Offenhartz disliked him, thus establishing a motive for Offenhartz's alleged untruths, and that Porat and his brother had had a falling out since the late 1980's, stemming from the circumstances surrounding the Swiss bank account.

The jury found Porat guilty of making a material false statement on Count Two. On January 19, 1993, following his conviction, the district court sentenced Porat under the Sentencing Guidelines. The district court determined that under the Guidelines, Porat's conviction amounted to a total offense level of 12. Having no prior criminal record, this placed Porat in the Guidelines imprisonment range of 10 to 16 months. The district court sentenced Porat to 5 months' imprisonment, 5 months' home detention, and a $10,000 fine. The district court ordered that Porat surrender for service of sentence by March 1, 1993. On February 2, 1993, the court held a hearing and permitted Porat to remain free on bond, pending final disposition of his appeal to this Court, with travel restricted to the United States and Israel.

## II.

The district court had jurisdiction in this criminal matter pursuant to 18 U.S.C. §§ 1623 and 3231. We have appellate jurisdiction over this appeal from the final decision of the district court pursuant to 28 U.S.C. § 1291 and over the government's cross-appeal from the sentence pursuant to 18 U.S.C. § 3742(b).

■ A district court's legal interpretation of the Sentencing Guidelines is reviewable de novo, but the court's factual determinations in applying the guidelines are reviewable for clear error. *United States v. Hickman*, 991 F.2d 1110, 1112 n. 3 (3d Cir.1993).

## III.

■ We will first address the government's argument that the district court erred in refusing to increase Porat's base offense for obstruction of justice pursuant to Sentencing Guidelines § 3C1.1. Section 3C1.1 provides that:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

United States Sentencing Commission, *Guidelines Manual*, § 3C1.1 (Nov.1992).[5] The Sentencing Guidelines do not require that the court find that the defendant succeeded in obstructing justice in order to receive an enhancement. Rather, a finding by the court that the defendant willfully "attempted to obstruct or impede" the administration of justice is sufficient grounds for an enhancement. U.S.S.G. § 3C1.1.

## A.

■ The government asserts that the district court erred when it failed to enhance

---

5. For purposes of our review, we have used the November 1992 Guidelines Manual, which embodies the Guidelines in effect at the time of Porat's sentencing on January 19, 1993. U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). The district court relied on these same Guidelines, except to the extent that the Guidelines in effect at the time of the offense were more favorable to the defendant. U.S.S.G. § 1B1.11(b) ("If the court determines that use of the Guidelines Manual in effect on the date the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines in effect on the date that the offense of conviction was committed.").

Porat's sentence despite evidence that Porat attempted to disguise his handwriting in exemplars provided to the government. In order to prove its case that Porat made a false material statement concerning the ownership of a Swiss bank account, the government introduced evidence that the signatures on Credit Suisse documents to open bank accounts in Switzerland were Porat's signatures. The government presented a handwriting expert who testified that the signatures on the Credit Suisse documents were Porat's. The handwriting expert also testified that Porat attempted to disguise his handwriting during a session in which the government sought handwriting exemplars from him.

Porat's handwriting exemplars were provided to the government's expert, along with the bank records and other documents containing Porat's signature. The handwriting expert testified that Porat provided exemplars in which he failed to join the letters of his last name. This was in contrast to signatures that Porat had made in the normal course of business which the government expert had studied. Based on his analysis, the expert testified that Porat had "intentionally disguised" certain exemplars provided to the government. Joint Appendix (JA) at 639.

During sentencing, the district court specifically addressed the government's contention that Porat's offense level should be enhanced. The court provided two reasons for its refusal to enhance. First, the court noted that there was no actual obstruction because the handwriting expert was permitted to examine original documents containing Porat's signature along with the exemplars and, second, that Porat admitted his signature at trial.

An application note accompanying § 3C1.1 provides a non-exhaustive list of examples of the types of conduct to which this enhancement applies. Included among these examples is "conduct prohibited by 18 U.S.C. §§ 1501–1516." U.S.S.G. § 3C1.1, comment. (n. 3(i)). The government asserts that Porat's attempt to disguise his signature falls within this category. Sections 1512(b)(1) [6] and 1515(a)(3)(D) [7] of Title 18 provide that the knowing submission of a sample that is misleading in a material respect for the purpose of influencing an individual's testimony is unlawful. This would apply to handwriting exemplars supplied by a defendant with the intent to mislead an expert who was comparing such samples with the known signature of the defendant. *See United States v. Ashers,* 968 F.2d 411, 413 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 673, 121 L.Ed.2d 596 (1992) (falsified voice exemplar warrants two level enhancement under § 3C1.1).

In *Ashers,* however, the court of appeals was reviewing the district court's determination that a two level enhancement for obstruction of justice was justified, whereas in this case the district court chose not to apply an enhancement. It is clear that, once a court finds that the defendant willfully obstructed or attempted to obstruct, an enhancement is required. *See United States v. Dunnigan,* —— U.S. ——, ——, 113 S.Ct. 1111, 1119, 122 L.Ed.2d 445 (1993) ("Upon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by [§ 3C1.1 of] the Sentencing Guidelines."); *United States v. Roberson,* 872 F.2d 597, 609 (5th Cir.), *cert. denied,* 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989) ("Section 3C1.1 is a directive to the court, instructing it to increase the offense level if it makes specific findings. Hence, if the court finds that the defendant obstructed justice, it must make the upward adjustment."). The difference here, as noted, is that the district court made a factual

6. 18 U.S.C. § 1512(b)(1) provides:
   Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding ... shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

7. 18 U.S.C. § 1515(a)(3)(D) provides:

   As used in sections 1512 and 1513 of this title and in this section the term "misleading conduct" means with intent to mislead, knowingly submitting or inviting reliance on a sample, specimen, map, photograph, boundary mark, or other object that is misleading in a material respect.

finding that the defendant did not obstruct or attempt to obstruct justice.

During the sentencing hearing, the district court specifically stated that one of the reasons it decided not to enhance Porat's sentence was because "there's no causal effect" between the handwriting exemplars provided by Porat and an actual obstruction of justice. JA at 1610. This conclusion, however, amounts only to a finding that Porat did not *actually* impede the administration of justice. If this alone constituted the district court's ruling, we would be compelled as a matter of law to find that the court erred in failing to enhance Porat's sentence. The Sentencing Guidelines expressly require that a defendant's offense level be enhanced not only for actual obstruction but for attempting to obstruct or impede. *See* U.S.S.G. § 3C1.1 ("If the defendant willfully obstructed or impeded, or *attempted* to obstruct or impede, the administration of justice ...") (emphasis added). A finding of no actual obstruction does not equal a finding of no attempt to obstruct. The Sentencing Guidelines are clear in that they are intended to punish not only successful efforts at obstruction, but also unsuccessful ones.

The district court stated its second reason for not enhancing Porat's offense level under Sentencing Guidelines § 3C1.1 was due to the fact that "[a]lthough [Porat] may not have admitted his signatures pretrial, at trial he admitted them." JA at 1611.[8]

During the trial, Porat presented a defense to the government's assertion that his signature appeared on the Credit Suisse bank records. Yael Azoulay, an employee of Pollack, testified that, when Porat conducted business in Israel for Pollack, he would sign many financial documents, often without taking the time to review them. This testimony buttressed Porat's assertion that his brother in Israel opened the Swiss bank accounts in Porat's name without Porat's knowledge. In this respect, Porat presented evidence at trial that the signatures on the bank records were his own.

Given this testimony, the court presented Porat with the opportunity to admit that all of the signatures bearing his name on the Swiss bank account records were his.[9] Although such a stipulation would have been consistent with Porat's defense, he declined the court's invitation, expressing concern that such an admission might incriminate him in proceedings against him in Israel.[10]

The ultimate consequence of Porat's purported attempt to disguise his handwriting would be to refute the government's assertion that the signatures on the Credit Suisse documents were his own. Despite the mixed record, there is evidence in it to support the district court's finding that Porat admitted his signature. Only if we find clear error in the district court's findings would we be in a position to reverse the court's decision that Porat's offense level should not be enhanced. Having reviewed the record, we cannot say it was clear error for the district court to find that Porat admitted his signature at trial. Consequently, we will affirm the court's decision that Porat did not willfully attempt to obstruct justice by providing disguised handwriting exemplars.

**B.**

The government next asserts that Porat's sentence should be enhanced for obstruction of justice based on the copy of the passport that Porat submitted into evidence. During the trial, the jury was presented with two copies of Porat's 1984 passport, one sub-

---

8. The Government also asserts that Porat's pretrial actions in attempting to disguise his handwriting merit an enhancement for obstruction of justice. The district court, however, listened carefully to Porat's explanations of the reasons for his signature appearing as it did in the exemplars. The district court found the evidence of obstruction to be "insubstantial." JA at 1612. Since the district court had the opportunity to weigh the credibility of the testimony, we cannot say that this determination was clearly erroneous.

9. Such a finding would have permitted the court to instruct the jury that they need not consider the testimony of the government's handwriting expert, whose purpose it was to demonstrate that the signatures on the Swiss bank documents were Porat's.

10. A defendant is not obligated to admit to portions of the government's proof. The discussion between Porat and the court took place as the parties reviewed the draft jury instructions concerning the testimony of the handwriting expert. Porat challenged language in the jury instructions that he denied that it was his signatures on the bank records. The court agreed to strike the language which stated that Porat denied that the signatures were his.

mitted by Porat and the other submitted by the government.[11] These copies of the passport were identical except for one distinguishing feature—the copy entered into evidence by the government contained three identification numbers while the copy submitted by Porat contained only two identification numbers. This distinction was critical, because the Credit Suisse bank documents bearing Porat's signature contained the third identification number which was present only on the government's copy of the passport.[12]

The government's copy of Porat's passport had been provided by Porat's attorney.[13] The passport identification number appeared on its cover and in perforated form at the top of each page. In addition, the passport contained an Israeli identification number. On the government copy, a third number appeared in handwriting at the upper left hand side of page 3. This number had been written in by the Israeli Consulate in New York. The passport identification number and the Israeli Consulate number matched the identification numbers from the passport used to open the bank accounts in Switzerland. This match provided critical evidence in the government's efforts to prove that Porat himself had opened the Swiss bank accounts.

During the trial, Porat entered into evidence a copy of his passport which did *not* include the Israeli Consulate number. The defense relied on the absence of this third, handwritten number to assert that Porat's passport was not the passport used to open the accounts in Switzerland, and, thus, Porat had not opened the accounts.

An application note, accompanying the Guideline for obstructing or impeding the administration of justice, includes among its non-exhaustive list of examples: "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." U.S.S.G. § 3C1.1, comment. (n. 3(c)). The government asserts that Porat's offense level should be enhanced because Porat willfully intended to mislead the jury by the use of the copy of his passport which did not contain the third identification number.

An essential element under Guidelines § 3C1.1 is that the defendant act "willfully" in obstructing or impeding, or attempting to obstruct or impede, the administration of justice. U.S.S.G. § 3C1.1. In *United States v. Belletiere,* 971 F.2d 961 (3rd Cir.1992), we held that "[b]ecause the government is the party seeking to upwardly adjust [the defendant's] sentence, the government bears the burden of proving by a preponderance of the evidence that the defendant *willfully* obstructed or impeded, or *willfully* attempted to obstruct or impede, the administration of justice." 971 F.2d at 965 (citation omitted).

At the sentencing hearing, the government submitted a letter from the Israeli government which stated that "[a]fter having examined the records of 1984, the numbers appearing on the upper left hand side of the passport are indeed correct and were written in by the consul in New York." JA at 1847. At sentencing, the government argued that this letter provided evidence that the copy it had submitted at trial was a true copy, and the copy which Porat submitted was an altered version.

---

**11.** Neither party introduced Porat's original 1984 passport into evidence. Prior to the trial, the government subpoenaed Porat for the passport. However, the government was only able to obtain a copy of it through Porat's attorney. In addition to its assertion that Porat submitted an altered copy of his passport into evidence at trial, the government asserts that Porat's failure to provide the original passport as required by the subpoena represents further grounds to enhance his sentence for obstruction. During the sentencing hearing, Porat stated that the Israeli government has possession of the passport. Despite the government's assertion that this was the first time it was made aware of the Israeli government's possession of the passport, the district court found that Porat had previously informed the government of this fact through his written submissions. The government has failed to point this Court to anything in the record which re-

futes this finding. Consequently, we hold that the court's finding was not clear error and thus reject the government's assertion that Porat's sentence should be enhanced on the ground that he failed to comply with the subpoena.

**12.** In general, a passport is used by Credit Suisse to serve as identification for foreign individuals desiring to open a bank account.

**13.** On June 26, 1989, Porat's attorney at the time, Ned Rosenberg, sent a copy of Porat's 1984 passport to the government. At trial, this copy was entered into evidence by the government without objection. Rosenberg, who did not represent Porat at trial, testified that the copy of the passport he provided to the government had been sent to him by Pollack from Israel.

In response to the government's argument that Porat had utilized an altered passport, the district court stated: "you're absolutely right about what happened at trial." JA at 1617. Despite this finding, the court proceeded to hold that:

I don't find the evidence that he *willfully* did this in the circumstances sufficiently persuasive. We have found throughout this because of the foreign governments involved ... there is a problem with the evidence. It's not of the quality that we generally get. The witnesses are not subject to cross-examination and I find the letter from the Israeli Embassy, without questioning its accuracy, not sufficient to convince me that Mr. Porat has *willfully* ... altered the document and *willfully* submitted a forged document.

JA at 1617–18 (emphasis added).

We do not necessarily have to agree that, were we the trial court, we would have come to the same conclusion, as did the district court, that the evidence adduced at the sentencing hearing was insufficient to convince it that Porat's actions were willful. Our task is to apply the clearly erroneous standard in reviewing the district court's determination that Porat did not willfully attempt to obstruct justice. *United States v. Cusumano,* 943 F.2d 305, 315 (3d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992). If the finding of the district court meets that standard, we will affirm.

The district court found that the letter from the Israeli government did not convince it that Porat willfully altered the passport or willfully submitted a forged document. The court expressed reluctance to rely on this evidence without the ability of Porat to cross-examine someone familiar with the content of the letter. The court then held that the government had failed to prove by a preponderance of the evidence that Porat obstructed justice.

The district court apparently did not agree with the government's argument that lack of evidence that Porat obliterated the third number innocently or by accident was proof that he willfully altered that document. Although we might draw a different conclusion from the evidence presented at the sentencing hearing, we cannot say that the determination of the district court was clearly erroneous.

## IV.

■ The government's final assertion on cross-appeal is that the district court's sentence of five months' supervised release conditioned on home detention in Israel is unlawful. In support, the government contends that only the Attorney General has the authority, pursuant to treaties entered into by the United States, to permit a defendant serving a sentence of imprisonment to serve that sentence in a foreign country. 18 U.S.C. § 4100, *et seq.* (implementing procedures for offender transfer treaties with foreign countries).[14] The government contends, correctly, that there is no similar statute authorizing a court to impose a sentence of imprisonment to be served in a foreign country. The government then argues that because under § 5C1.1(e)(3) of the Guidelines home detention is simply a substitute for imprisonment, it is the equivalent of imprisonment, and a court cannot impose a sentence of home detention in a foreign country.

Porat is eligible for a sentence, in part, of home detention under § 5C1.1(d) of the Guidelines which provides that, if the defendant's sentence falls within Zone C of the Guidelines (as in Porat's case),

the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.

U.S.S.G. § 5C1.1(d).

Under the schedule for substitute punishments, Guidelines § 5C1.1(e)(3) provides that

---

14. 18 U.S.C. § 4102 provides in part:
   The Attorney General is authorized—
   (1) to act on behalf of the United States as the authority referred to in a treaty;
   . . . .

(3) to transfer offenders under a sentence of imprisonment, on parole, or on probation to the foreign countries of which they are citizens or nationals. . . .

a defendant afforded home detention must serve one day of home detention for each day of imprisonment. After determining that Porat's minimum sentence under the Guidelines was ten months, the district court sentenced Porat to five months' imprisonment and substituted five months of supervised release conditioned on home detention for the remaining five months of imprisonment.

According to the government, because there is no statutory authority for the courts to allow defendants to serve imprisonment abroad, there is no authority for the court in this instance to permit Porat to serve his home detention outside of the United States. The statute referred to by the government does not, however, apply to the conditions of the sentence imposed here. Section 4102 provides for the transfer of an offender into the custody or supervision of the prison authorities of the transferee nation. It envisages a formal agreement between the officials of two countries that an offender will become the responsibility of the receiving nation.

The sentence imposed on Porat does not, however, place him under the supervision or control of the Israeli government or of its prison authorities. The district court ordered Porat to report to the probation office in the district to which he is released without specifying what district that would be. One can only presume that it would be the probation office of the Eastern District of Pennsylvania.[15] The conditions of his home detention were further described as follows:

> Defendant's period of supervised release shall be spent at his home in Israel. During this time, in addition to the standard terms of supervised release, defendant shall comply with whatever reporting requirements are outlined by the Probation Office. The Probation Office is directed forthwith to arrange for defendant's reporting and supervision for this five-month period while defendant is at home in Israel

Sentencing Report at 3.

Porat is required to maintain the normal close interaction with the probation office. He is required to make regular written reports to the probation officer, as well as be available for visits by the officer at any time. We do not see how the probation office can maintain proper oversight of Porat's supervised release if Porat is allowed to serve this portion of his sentence outside of the United States.

We have not found any case in which a court has authorized a defendant to serve a sentence of supervised release outside of the United States.[16] The only case analogous to the current dispute is *United States v. Pugliese*, 960 F.2d 913 (10th Cir.1992), in which the court of appeals considered whether the defendant's sentence could be modified to allow him to serve his supervised release outside of the United States. The defendant, a United States citizen, was convicted of trafficking in heroin and counterfeit goods and sentenced to seventy-eight months in prison and four years' supervised release. While imprisoned, Pugliese sought the court's permission to serve his supervised release in Thailand where his wife and child lived. The district court denied the defendant's motion, noting that it knew "of no way for supervised release to take place outside

---

**15.** It is the probation office of the Eastern District of Pennsylvania with which Porat has been negotiating means of supervision if he should be permitted to perform his home detention in Israel.

**16.** There have been instances in which district courts have ordered aliens convicted of unlawful activity to be deported as a condition of their probation. The cases we have reviewed have resulted in reversals. *See United States v. Jalilian*, 896 F.2d 447 (10th Cir.1990) (holding that district court could not lawfully order alien, guilty of converting a treasury check to his own use, to be deported as a condition of probation even though alien was not legally authorized to be in the United States); *United States v. Abushaar*, 761 F.2d 954 (3d. Cir.1985), *cert. denied,* 479 U.S. 951, 107 S.Ct. 439, 93 L.Ed.2d 388 (1986)

(holding, *inter alia,* that district court exceeded its authority in imposing condition on alien's probation that he serve probation outside of United States). The present dispute is distinguishable. Porat's conviction does not amount to an offense for which he could be deported. *See* 8 U.S.C. § 1252 (Attorney General has authority to take into custody for purposes of initiating deportation proceedings any alien convicted of an aggravated felony). Courts may, as a condition of supervised release, provide that an alien defendant who is subject to deportation be deported and remain outside the United States. 18 U.S.C. § 3583(d). The district court did not act pursuant to this section. Neither party has asserted that the court had the authority under § 3583(d) to order that Porat be deported.

of the United States." *Id.* at 915 (internal quotations omitted).[17]

While the court of appeals in *Pugliese* found "no direct [legal] impediment to authorizing a person on supervised release to leave the United States, if the supervision the judge believes is necessary can be enforced abroad," it upheld the district court's decision denying the defendant's motion. *Id.* In affirming the district court's decision, the court of appeals considered the terms of the defendant's supervised release, including regular, frequent monitoring by a trained probation officer. It held, as did the district court in that case, that these conditions could not be met in Thailand.

Unlike the supervised release ordered in *Pugliese*, the district court here ordered home detention as a condition of Porat's supervised release. In terms of the types of requirements that might be imposed as a condition of supervised release, home detention is perhaps the most serious and most constraining in terms of the impact it has on the defendant's liberty.[18] Given the seriousness of the sentence, proper supervision is required.

Having determined that home detention is suitable in this particular instance, there must be assurance that the defendant complies with his sentence. To do so, the probation office must closely monitor his actions. In order that the probation office effectively perform its responsibilities, we believe that Porat must serve his home detention in the United States. It is not clear that the probation office could properly ensure that Porat is complying with his sentence if he is allowed to serve his term of supervised release in Israel.

Porat maintains that the probation office has entered into a contract with an American company to maintain electronic monitoring during his home detention in Israel. Even with this monitoring, there is no substitute for the supervisory role performed by the probation officer.

In addition, there is a serious question of the ability of the district court to enforce the home detention aspect of Porat's sentence if he violates the court's order. In his brief to this Court, Porat maintains that he would waive any right to contest extradition to the United States if he is found to have violated any of the conditions of his supervised release. In addition, Porat suggests that he is a frequent traveller to this country, and should he violate the provisions of his sentence, the United States could regain custody over him. Lastly, Porat proposes that the United States retain his bail until his sentence is completely served. We find these suggestions insufficient to ensure that Porat will serve his time in the manner directed by the district court. In the first place, they do not provide for ongoing contact with a supervising probation officer. Of equal significance is the fact that, should Porat violate the conditions of home detention and decide to end any cooperation with the district court, the district court might find it difficult, or even impossible, to bring Porat before it to consider appropriate remedial measures.

---

**17.** The government argues that, even if effective oversight and enforcement of supervised home release were possible in Israel, the district court lacks the authority to order supervised home release abroad in light of the presumption " 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). We need not reach this issue because we hold that neither the probation office nor the district court could assure Porat's compliance with the terms of his sentence if he were permitted to serve a portion of it in Israel.

**18.** This is the reason why home detention may only be ordered as a substitute for imprisonment. U.S.S.G. § 5F1.2. The Application Note to Guidelines § 5F1.2 provides:

"Home detention" means a program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs, and such other times as may be specifically authorized. Electronic monitoring is an appropriate means of surveillance and ordinarily should be used in connection with home detention. However, alternative means of surveillance may be used so long as they are effective as electronic monitoring.

U.S.S.G. § 5F1.2, comment. (n. 1).

Under the Guidelines, Porat's minimum sentence must be served. The district court clearly had the authority under the Guidelines to substitute supervised release conditioned on home detention for one-half of Porat's minimum sentence. Accordingly, the court and the probation office have the responsibility to see that Porat complies with the terms of his sentence. In order to maintain the required supervision, we hold that Porat must serve his complete sentence in the United States.

This situation is different than that posed by a United States citizen on probation who is given permission by the court to travel. The permission to take a specific trip, with the probationer's return guaranteed as appropriate by secured bond or other safeguards, is not comparable to the supervision required over a five-month period of home detention. Although the defendant has recommended several remedies to ensure his compliance with the conditions of his home detention, we do not find them sufficient to justify relaxing the district court's obligation to insure that Porat comply with the ongoing supervision involved in this type of sentence.

Both the United States and Porat have noted in their briefs to this Court their agreement that, if we determine that the district court lacked the authority to permit Porat to serve his home detention in Israel, Porat should serve home detention in the United States. This would comply with the law.

### V.

For the foregoing reasons, we hold that the district court did not err in its decision not to enhance Porat's offense level. We will affirm the court in this respect. However, we will vacate that part of the court's sentence which permitted Porat to serve five months of his sentence in Israel and we will remand for resentencing to provide that the home detention portion of Porat's sentence be served in the United States.

Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges.

*SUR PETITION FOR REHEARING*

April 14, 1994

The petition for rehearing filed by appellant, Amir Porat, in the above-entitled case 17 F.3d 660 having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.