**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Isa YUSUFU, a/k/a Uni Kano, a/k/a David Barbarine, Defendant–Appellant.**

No. 94–3608.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1995.

Decided Aug. 1, 1995.

Matthew L. Jacobs, Asst. U.S. Atty. (argued), Office of U.S. Atty., Milwaukee, WI, for plaintiff-appellee U.S.

Laurence M. Moon (argued), Whitefish Bay, WI, for defendant-appellant Isa D. Yusufu aka David M. Barbarine aka Uni Kano.

Before CUMMINGS, KANNE, and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

While serving a prison sentence (for what crime we do not know) at the Federal Correctional Institution in El Reno, Oklahoma— (FCI–El Reno), Isa Yusufu concocted a scheme to manufacture income. While at FCI–El Reno, he received an account application from Strong Mutual Funds (Strong Funds), an investment management company located in Menomonee Falls, Wisconsin. When he was released from prison in early 1993, he, in conspiracy with Vincett Duckett, submitted the application under the name David Barbarine to Strong Funds along with five money orders purporting to be worth $1,000 each. The money orders had been altered from their actual values of $20.50 each. Later, he supplemented that deposit with a cashier's check purporting to be worth $85,000 that was actually worth only $5.00. After this second deposit, Strong Funds caught on and alerted the FBI; Yusufu's conspiracy was put to an end a few days later, but the search for the real David Barbarine continued for several more months.

Eventually, the FBI accurately identified Yusufu as Duckett's coconspirator. A jury convicted Yusufu of one count of conspiracy under 18 U.S.C. § 371 and two counts of unlawfully transporting altered securities in interstate commerce under 18 U.S.C. § 2314 (crimes that also served as the predicates for the conspiracy count). The district court sentenced Yusufu to 41 months' imprisonment, a $2,000 fine, and three years' supervised release following imprisonment. Yusufu appeals his conviction, claiming that the government provided insufficient evidence on which to convict him and that his previous incarcerations should not have been disclosed to the jury. He also appeals his sentence, arguing that the district court calculated improperly the amount of loss he caused and erred in finding that he had obstructed justice.

## I. The Convictions

### A. Sufficiency of the Evidence

Yusufu argues that the government failed to prove beyond a reasonable doubt that it was he who transported altered securities interstate and conspired with Vincett Duckett to do so. Therefore, we will review the evidence to determine only whether it provided a sufficient basis for a jury to determine beyond a reasonable doubt that the defendant participated in the scheme to the extent required by the conspiracy and substantive statutes.

As a general matter, we will reverse a jury's verdict for insufficiency of the evidence only if, when the evidence and its accompanying inferences are considered in the light most favorable to the government, no reasonable juror could have found the defendant guilty of the challenged elements of the crime beyond a reasonable doubt. *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). However, the evidence linking a defendant to a conspiracy must be substantial to sustain the jury's verdict. *Durrive*, 902 F.2d at 1229. Each element of the conspiracy may be proved by circumstantial evidence. *United States v. Jensen*, 41 F.3d 946, 954 (5th Cir.1994), *cert. denied,* ——U.S. ——, 115 S.Ct. 1835, 131 L.Ed.2d 754 (1995). We do not reweigh the evidence or re-judge the credibility of the witnesses un-

less the testimony is so improbable on its face that no reasonable factfinder could accept it. *United States v. Saunders,* 973 F.2d 1354, 1358 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993); *United States v. Dortch,* 5 F.3d 1056, 1065 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994).

■ The participation elements of conspiracy, to which Yusufu directs his sufficiency challenge, require that the government prove that the conspiracy existed, that the defendant knew of the conspiracy, and that the defendant intended to join and further the conspiracy's aims. *United States v. Roberts,* 22 F.3d 744, 748 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 744, 130 L.Ed.2d 645 (1995).

The first clue the FBI had to Yusufu's participation was that Yusufu accompanied Duckett when the FBI delivered to Duckett, who posed as David Barbarine, withdrawals from the Barbarine account on May 13, 1993. At that time Yusufu gave the FBI and the Houston police the false name of Roman Akeh. The FBI searched Duckett's car and found a Federal Express package containing two Strong Funds share drafts, drawn on the account of David M. Barbarine, made out to Kenneth Williams. This package was addressed to Kenneth Williams at 11254 Huston Street, # 101, North Hollywood, California, 91601, the address of the real Roman Akeh, who happened to be Yusufu's cousin. Yusufu had been staying at this address in California intermittently during the Spring of 1993, though his cousin knew him only as Emmanuel Joseph and knew of no one named Kenneth Williams.

Also noteworthy about these packages is that the return address was to Crown Oil Field Services at a post office box that had been established by someone claiming to be "Uni Kano Ibrahim." This name was strikingly similar to the name, "Uni Kano," that Yusufu had given to Houston police when stopped in April 1993. It was also similar to the name, "Uni Y. Kano," attached to the telephone service for the portable phone Houston police found in Yusufu's car during that April stop. This same phone was later used to make nine calls to Strong Funds in

May 1993. Additionally, INS files show that Crown Oil Field Service's Federal Express account was used to ship to the INS correspondence related to an immigration dispute between Yusufu and the INS.

After arresting Duckett, the FBI agents tried in vain to identify Yusufu. Eventually they contacted the Houston Police Department, who took the defendant into custody in order to identify him. Yusufu told a Houston police officer, as he had told the FBI agents, that his name was Roman Akeh. The police fingerprinted him, and those fingerprints matched those of a person previously identified by Houston police as Uni Y. Kano (the name Yusufu had given Houston police in April 1993). The defendant, however, denied knowing anyone by that name. Houston police arrested the defendant on charges of failing to identify himself, but then released him on bond.

Between May 1993 and August 1993, someone negotiated in the Los Angeles area at least three other Strong Funds share drafts drawn on the Barbarine account. Yusufu was arrested in the Los Angeles area on August 17, 1993 under the name Emmanuel Joseph.

■ These facts provided the jury with substantial evidence that Yusufu or Duckett was about to send the share drafts found in the car from one fictitious entity, Crown Oil Field Services, to another, Kenneth Williams. They also provide substantial evidence for the jury to have found that Yusufu intentionally promoted the scheme by providing his cousin's address knowing that he, Yusufu, would be able to receive the share drafts at that address, at which point he could negotiate them further. These findings would suffice to lead the jury to conclude that it was Yusufu who conspired with Duckett to transport altered securities interstate. Therefore, the evidence sufficiently supports his conviction on the conspiracy count.

■ The crime of interstate transportation of altered securities, counts two and three of the indictment, includes the following elements: 1) the defendant caused the securities to be transported in interstate commerce; 2) at the time the defendant caused

the transportation of the securities, the securities were altered; 3) the defendant knew, at the time he caused the securities to be transported interstate, that the securities were altered; 4) the defendant acted with unlawful or fraudulent intent. *See* 18 U.S.C. § 2314. Again, Yusufu contests only the first element: whether it was he who conspired with Duckett to commit the offense.

To convict the defendant of each of the two counts of this crime, the government had to provide evidence from which a reasonable jury could conclude beyond a reasonable doubt that either the defendant or his coconspirator, Duckett, fulfilled all of the elements with respect to each count. *See Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946) (holding that a party to a conspiracy may be prosecuted for a substantive offense committed by a coconspirator in furtherance of the conspiracy even if that party did not participate in or have knowledge of the substantive offense).

■ Strong Funds sent the application used to open the Barbarine account to "Is Yusufu" at FCI–El Reno at a time when the defendant (whose apparent real name, as a reminder, is Isa Yusufu) was incarcerated at FCI El Reno. Handwriting experts at trial testified that whoever filed a motion in the U.S. Court of Appeals for the Fifth Circuit on behalf of Yusufu on November 3, 1993 also completed the Strong Funds application for the Barbarine Account, inscribed the printing on the altered money orders, filled out the labels on the Federal Express shipping label on the package addressed to Kenneth Williams, and wrote on the white envelope and two Barbarine share drafts found inside the Williams package. The government also introduced evidence that Yusufu's motion to the Fifth Circuit was sent from the Harris County, Texas jail, that he was an inmate at the jail from August 31, 1993 until November 3, 1993, and that the motion was covered with his fingerprints. Additionally, the Strong Funds application and the accompanying altered money orders were not submitted to Strong Funds until after Yusufu was released from federal custody. It would be reasonable for the jury to conclude from this evidence that Yusufu opened the account by submitting the application and that he altered the money orders and used them as the initial deposit. Such a conclusion would fulfill the contested elements of the first count of interstate transportation of altered securities (count two of the indictment) by establishing that the defendant, knowing that they were altered, transported altered securities (the money orders) in interstate commerce to Strong Funds, or at least caused Strong Funds to transport them interstate through the bank collection process.

■ The second count of the substantive offense (count three of the indictment) is based on the altered cashier's check that came to Strong Funds, via express mail, with a face value of $85,000, but that had been purchased at a face value of only $5.00. The check indicated that the purchaser had been David M. Barbarine, the same name Yusufu used to open the Strong Funds Account. It also indicated that Barbarine's address was 8039 Boone Road, # 309, Houston, Texas 77072. It was to this same name and address that Strong Funds sent via Federal Express the check for $5,000 that became the subject of the controlled delivery that netted Duckett. A reasonable jury could, we believe, conclude from these facts that either Duckett or Yusufu had altered the cashier's check and sent it to Strong Funds to be deposited in the Barbarine account. Such a conclusion would establish either that Yusufu had transported the security in interstate commerce knowing it had been altered or that Duckett had done so. Because there was sufficient evidence to support a finding that the two conspired, either interpretation of the evidence is sufficient to sustain Yusufu's conviction. *See Pinkerton,* 328 U.S. at 644–47, 66 S.Ct. at 1184.

*B. The Admissibility of the Defendant's Prior Incarcerations*

■ Yusufu also alleges that the district court erred in admitting into evidence his prior incarcerations at FCI–El Reno from 1989 until October 1992, at INS detention in Oakdale, Louisiana from October 1992 until March 1993, and at the Harris County, Texas, jail during August 1993. We review the district court's decision to admit evidence of

past bad acts or crimes for abuse of discretion. *United States v. Prevatte*, 16 F.3d 767, 774 (7th Cir.1994).

■ The Federal Rules of Evidence do not allow evidence of other crimes, wrongs, or acts to be admitted into evidence in order to show action in conformity therewith. FED. R.EVID. 404(b). Here, the government's evidence was not of other acts, but merely of Yusufu's prior incarcerations, evidence that implies he committed other bad acts. Yet there was no suggestion to the jury that Yusufu was incarcerated earlier because he had committed crimes similar to this one, or that his earlier incarcerations made it more likely that he committed the charged crime. The Rules account for alternative bases for seeking to admit evidence of prior bad acts, allowing such evidence to be admitted to show, among other things, the opportunity to commit an act or preparation for committing the act, but only if the probative value of such use is not substantially outweighed by its unfairly prejudicial impact on the jury. *Id.*; FED.R.EVID. 403; *United States v. Lashmett*, 965 F.2d 179, 184 (7th Cir.1992). Moreover, "[r]ule 404(b) permits the introduction of evidence of another crime, wrong, or act *unless* the sole purpose for the offer is to establish the defendant's propensity for crime." HANDBOOK OF FEDERAL EVIDENCE § 404.5 at 213 (West, 1991).

■ We generally look at four factors to determine whether evidence of other crimes, wrongs, or acts should be admitted: whether 1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; 2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; 3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; 4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *See United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984) (prongs 1, 2, and 4); *Huddleston v. United States*, 485 U.S. 681, 690–91, 108 S.Ct. 1496, 1501–02, 99 L.Ed.2d 771 (1988) (prong 3); *see also Prevatte*, 16 F.3d at 774.

Here we examine evidence of other crimes that disclosed nothing about the nature of the earlier criminal act. The fact of defendant's incarceration told the jury nothing from which the jury could infer that he was of the character to commit the crime of interstate transportation of altered securities. The evidence did not concern the acts themselves, only Yusufu's domicile during specific periods of time.

The government postulated that Yusufu's incarcerations in FCI–El Reno and the INS facility in Oakdale might legitimately be used to establish his opportunity to commit the crime charged in two ways. First, by placing Yusufu at the address where Strong Funds sent the account application, it helped establish Yusufu's initial connection to the account. Second, it showed Yusufu's lack of opportunity to submit the application for a long period of time.

■ We have held that evidence of a prior incarceration is admissible to fill a "chronological or conceptual void." *Lashmett*, 965 F.2d at 185. In *Lashmett* we upheld the district court's acceptance into evidence that the defendant recruited co-conspirators in an insurance fraud scheme from prison. Lashmett's incarceration showed his motive—his incapacity to engage in the fraud himself—for recruiting the others. *Id.* at 184. We believe that the evidence of the defendant's incarceration at FCI–El Reno and at the INS facility in Oakdale helped explain similar chronological or conceptual voids. As the government argued, the evidence of incarceration at FCI–El Reno helped link Yusufu to the Strong Funds account, the center of the conspiracy. And if the jury had heard that Strong Funds sent the account application to Yusufu in 1990 and that the application was not used until 1993, and then only by someone purporting to be David Barbarine, it would be more likely to conclude that someone other than Yusufu had taken possession of it and submitted it. Once the jury knew that Yusufu was in prison during that period, it had a reasonable explanation for the application's dormancy—Yusufu did not have the opportunity to conduct this scheme while he was in prison. This explanation satisfies each of the

512

first two prongs of the *Shackleford/Huddleston* inquiry.

To prove that Yusufu was incarcerated at each of the federal facilities, the government presented the testimony of the Assistant Department Head of the Inmate Systems Management Department at FCI–El Reno, who testified that Yusufu was an inmate at FCI–El Reno from November 21, 1989 to March 19, 1992, when he was transferred to Oakdale. This evidence satisfies the third inquiry, whether the evidence could lead a reasonable juror to find the fact at issue (that is, whether the defendant was incarcerated where and when the government said he was).

The government's theory for admitting evidence of Yusufu's incarceration at the Harris County jail was that it helped establish that Yusufu handwrote his own motion to the Fifth Circuit that he filed on November 3, 1993. It was this motion that helped handwriting analysts link Yusufu to the writing on the Strong Funds account application and the altered money orders. Ironically, it was Yusufu's own incorrigible actions that made admitting this evidence necessary. Yusufu had completed handwriting exemplars that, if completed freely and naturally, could presumably have linked him to the application and the money orders. However, handwriting analysts concluded that he did not execute the exemplar freely and naturally (more on the consequences of this later).

So, the government had to look to the defendant's motion to the Fifth Circuit for a freely and naturally executed exemplar. Of course, that meant the government also had to show that the defendant wrote the motion himself. The motion was filed in the Fifth Circuit on November 3 and was mailed from the Harris County jail. Therefore, if Yusufu were incarcerated at the Harris County jail on November 3, it would be all the more likely that he handwrote the motion himself. We are satisfied that this is a sufficient theory for admissibility of evidence of defendant's incarceration in the Harris County jail. And the evidence presented, the testimony of the custodian of inmate records at the Harris County jail that the defendant was incarcerated there from August 31, 1993 to November

ber 3, 1993 under the name Uni Kano, was sufficient to establish that Yusufu was in fact incarcerated there during that period.

As for the final part of the *Shackleford/Huddleston* test, none of the evidence of the three incarcerations was so unfairly prejudicial as to outweigh substantially the probative value discussed above. Professor McCormick suggests several factors to consider when conducting this balancing test. Those relevant here include the need for the evidence, whether alternative proof would be effective, and "the degree to which the evidence probably will arouse the jury to overmastering hostility." McCormick, EVIDENCE, § 190 (4th ed., West, 1992) (abridged version p. 347).

As the above discussion indicates, the evidence of Yusufu's incarcerations at FCI–El Reno and at the INS facility in Oakdale, Louisiana was necessary to establish the defendant's opportunities to commit the crime and to trace his identity. Without that evidence, the government would have been significantly less able to link the defendant's real name with the various aliases he used to execute the scheme. The government would not have been able to demonstrate how and when the defendant applied for the account or why a three-year gap existed between the time it sent the application and the time the Barbarine account was opened. No other proof would have been effective here, as defendant's domicile was crucial to putting his criminal acts in context. And we do not believe that the evidence that the defendant was in prison before he began to execute this scheme probably would have aroused overmastering hostility among the jurors.

The evidence of the defendant's incarceration in the Harris County jail was necessary to establish the defendant's handwriting patterns. Without it, the government might not have been able to link the defendant to the writing on the Strong Funds application and the altered money orders. The defendant himself made admission of this evidence necessary when he attempted to disguise his handwriting while completing handwriting exemplars for the FBI. And, again we do not believe that the fact that the defendant was incarcerated in a Texas county jail at

some point during the government's investigation of this scheme would have aroused overmastering hostility among the jurors.

Additionally, the trial did not dwell on Yusufu's incarcerations, the government did not even mention the conduct that predicated them, and the court instructed the jurors to limit their consideration of the evidence to the question of opportunity, preparation, plan, or identity. *See Lashmett,* 965 F.2d at 185. We are satisfied that the district court did not abuse its discretion in admitting the evidence of defendant's prior incarcerations.

## II. Sentence

### A. *Calculation of Loss*

In order to calculate Yusufu's offense level, the district court began with United States Sentencing Guidelines (U.S.S.G.) § 2F1.1, which applies to, among other crimes, "Offenses involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." Under this section, the defendant's base offense level was six, and the district court added six levels, as directed by § 2F1.1(b)(1)(G), after finding that the defendant's crimes caused a loss of $90,000. Yusufu appeals this upward adjustment.

■ The court calculated the amount of loss Yusufu caused by adding the raised amount of the altered money orders, $5,000, to the raised amount of the altered AmSouth cashier's check, $85,000. Yusufu claims that only $5,000 should be counted, however, because the only check drawn on the Strong Funds account was for $5,000. The altered $85,000 AmSouth check was discovered before any funds could be drawn on it, the defendant argues, so there was no loss to associate with it. We review the district court's calculation of the amount of loss associated with a defendant's offense under § 2F1.1(b) for clear error. *United States v. Dillard,* 43 F.3d 299, 308 (7th Cir.1994). However, we review plenarily the district court's interpretation of the meaning of loss under § 2F1.1(b)(1). *United States v. Mount,* 966 F.2d 262, 265 (7th Cir.1992).

The commentary to § 2F1.1, which is authoritative, *Stinson v. United States,* —— U.S. ——, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993), states in Application Note 7 that, "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss.... For example, if the fraud consisted of ... representing that a forged check for $40,000 was genuine, the loss would be $40,000." U.S.S.G. § 2F1.1 comment. (n. 7).

■ This case is similar to the Guidelines example of the $40,000 forged check. Yusufu's conspiracy represented to Strong Funds that the money orders were worth $5,000 and that the cashier's check was worth $85,000. In the Guidelines example, we don't know whether the perpetrator presented the forged check when trying to deposit it or when presenting it for cash. But it should not matter: causing the bank collection process to intervene, perhaps as a means of laundering the fraud, should not reduce the amount of loss. The way we understand Yusufu's argument, if he had cashed the altered money orders and cashier's check immediately, he would agree that the amount of loss was $85,000. Yusufu should not be treated with a lighter touch merely because he first deposited the altered securities into a money market account before attempting to redeem them for cash.

We have held that, where a defendant fraudulently deposited $405,000 into a bank account but only withdrew $36,000, the loss is $405,000. *United States v. Strozier,* 981 F.2d 281, 284 (7th Cir.1992). As in *Strozier,* a case in which the defendant was convicted of mail fraud for writing bad checks to cover his deposits, Yusufu's crime was complete before he withdrew the fraudulently represented cash. The money he made available to himself by way of depositing the fraudulent securities demonstrates the amount of loss Yusufu intended to cause.

Yusufu argues that we should adopt the Sixth Circuit's position that a court can determine intended loss under § 2F1.1 n. 7 only by applying the attempt Guidelines of § 2X1.1(b)(1). *See United States v. Watkins,* 994 F.2d 1192, 1196 (6th Cir.1993). We have apparently never adopted this position, *see Strozier,* 981 F.2d at 284, and we do not do

so here. Guideline § 2X1.1 applies to "Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense Guideline)." This section instructs courts to reduce the base offense level for the substantive crime if the defendant merely solicited, attempted, or conspired to commit it. The defendant is not entitled to such a reduction, however, if he completed all the acts he (or his coconspirator) believed necessary for the successful completion of the substantive offense "or the circumstances demonstrate" that he (or his coconspirator) was about to complete them "but for apprehension or interruption by some similar event beyond their control." U.S.S.G. § 2X1.1(a), (b). Application Note 7 to § 2F1.1 states that using intended loss where it is greater than actual loss is consistent with § 2X1.1, but it does not draw upon § 2X1.1's attempt requirements for determining intended loss. Guideline § 2F1.1, along with § 2B1.1 (dealing with larceny, embezzlement, other forms of theft, and dealing in stolen property in various ways) does employ these provisions of § 2X1.1 to determine offense level in cases of partially complete offenses (e.g., where a completed fraud or theft was part of a larger fraud or theft that was not complete). But this has nothing to do with the amount of loss for a completed crime. It has only to do with adding additional offense levels for attempted crimes where the defendant was caught in the middle of a larger scheme and is convicted only of the crimes he had completed up to the point where he was caught. *See, e.g., United States v. Sung,* 51 F.3d 92, 95 (7th Cir.1995) (applying § 2X1.1 where the crime of trademark infringement was complete with regard to some of the infringing shipping boxes but was not complete with regard to others. We used § 2X1.1 to analyze how to add additional offense levels for the unsent boxes (that is, those boxes that represented attempted crimes instead of completed crimes)).

The district court properly determined that the amount of loss under § 2F1.1 was the amount of the intended loss. Moreover, the face amount of the altered securities charged in the indictment provided sufficient evidence for the district court to conclude that the intended loss was in excess of $70,000 but less than $120,000.[1]

### B. Obstruction of Justice

Finally, we examine whether the district court properly increased the defendant's offense level by two for obstructing justice. The defendant argues that the district court did not make sufficient findings of all the elements of obstruction. We review the district court's finding that the defendant obstructed justice for clear error. *United States v. Wright,* 37 F.3d 358, 361 (7th Cir. 1994).

Guideline § 3C1.1 provides for an offense level increase of two where the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. The commentary to this section provides that "concealing ... evidence that is material to an official investigation ... or attempting to do so", and "conduct prohibited by 18 U.S.C. §§ 1501–1516" constitute obstructive conduct. U.S.S.G. § 3C1.1, comment. (n. 3(d), and 3(i)).

We do not doubt that willfully disguising a handwriting exemplar that is to be provided to the FBI for comparison to writings that will be introduced at trial amounts to the sort of obstruction of evidence contemplated by § 3C1.1. To begin with, it amounts to concealing evidence, one's handwriting style, that, in this case, was material to the official investigation. Additionally, 18 U.S.C. §§ 1512(b)(1) and 1515(a)(3)(D) provide that knowingly submitting a sample that is misleading in any material respect in order

---

1. It may have been error, albeit harmless, for the district court to find that the loss was precisely $90,000, however. Application note 7(a) instructs the court to account for the actual value of an item and its misrepresented value. Here, the money orders were worth $20.50 each, for a total of $61.50. The cashier's check was worth $5.00. The total value of the securities, $66.50, should be subtracted from the misrepresented amount, $90,000, to arrive at the intended loss, $85,933.50. This amount remains in the same loss range as $90,000, so the court effectively committed no error in determining Yusufu's sentence.

to influence an individual's testimony is unlawful.

Moreover, other courts have applied § 3C1.1 to handwriting exemplars. *See, e.g., United States v. Porat,* 17 F.3d 660, 665 (3rd Cir.1994) (noting that § 3C1.1 would apply to a handwriting exemplar supplied by a defendant with the intent to mislead a handwriting expert, but affirming the district court's conclusion that the defendant did not wilfully attempt to obstruct justice); *United States v. Valdez,* 16 F.3d 1324, 1335 (2nd Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 60, 130 L.Ed.2d 18 (1994) (relying in part on the defendant's unsuccessful attempt to disguise his handwriting when giving exemplars to justify an increase for obstruction of justice); *United States v. Reyes,* 908 F.2d 281, 290 (8th Cir.1990), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991) (holding that refusal by a defendant to provide a handwriting exemplar effectively concealed the defendant's handwriting style and amounted to an obstruction of justice because his handwriting style was material evidence at trial).

■■■ Generally, the district court must state clearly on the record either that the defendant willfully obstructed justice or attempted to do so in order to apply the obstruction increase. U.S.S.G. § 3C1.1; *see United States v. Romulus,* 949 F.2d 713, 717 (4th Cir.1991), *cert. denied,* 503 U.S. 992, 112 S.Ct. 1690, 118 L.Ed.2d 403 (1992). The district court stated on the record that it found, correctly established in the Pre–Sentence Report (PSR), that the defendant attempted materially to affect the government's case.[2] A defendant's mere attempt to obstruct the government's case is sufficient to qualify him for the obstruction increase. U.S.S.G. § 3C1.1. Moreover, we believe that a finding of attempt is tantamount to a finding of willfulness. Implicit in the meaning of attempt is the will of the actor to accomplish the act attempted. *See* FEDERAL CRIMINAL JURY INSTRUCTIONS FOR THE SEVENTH CIRCUIT

§ 5.10. There is no such thing as attempted negligence or attempted recklessness.

■■■ We believe the record supports the district court's finding. The defendant took six hours to complete the twelve one-sided pages of exemplars. A handwriting analyst for the FBI, Charles Haywood, determined that they were not freely and naturally executed despite the fact that Yusufu had signed a statement saying they were. The defendant's handwriting expert, Bonnie Schwid, agreed that the exemplar was not freely and naturally executed. Another exemplar of Yusufu's free and natural handwriting led experts to conclude that he wrote the Strong Funds application, the altered money orders, and the Federal Express address labels. It was reasonable for the district court to conclude from this evidence that Yusufu realized his free and natural hand would incriminate him in the crimes with which he was charged and that, in order to evade the link to the incriminating evidence, working very slowly, he altered his handwriting so that it would not match other specimens.

■■■ The district court must also find clearly on the record that the defendant's allegedly obstructive act was material in order to apply the increase. *United States v. DeFelippis,* 950 F.2d 444, 447 (7th Cir.1991). Application Note 5 to § 3C1.1 states that material evidence is evidence that, if believed, would tend to influence or affect the issue under determination. The district court plainly agreed on the record with the PSR that the handwriting exemplars were material. Moreover, the FBI had Yusufu produce the exemplar as part of its investigation so that it could compare Yusufu's handwriting to handwriting on various evidentiary exhibits, such as the altered money orders and the Strong Funds account application. Such a comparison would, the FBI hoped, link Yusufu to the altered securities that formed the basis of the indictment against him. Yusufu's handwriting exemplars, therefore, would tend to influence the prosecutor's, and eventually the jury's, determination

---

**2.** The Federal Rules of Criminal Procedure allow *the court to accept the PSR as its findings of fact,* except for unresolved objections. FED.R.CRIM. PRO. 32(b)(6)(D). Here, the district court re-

solved on the record the objections Yusufu had to *the facts supporting the obstruction increase.* Therefore, the court found facts in sufficient detail when it accepted the PSR.

of whether, in fact, Yusufu could be linked to the altered securities. Therefore, we agree with the district court that the handwriting exemplar was material.

The district court's decision to increase the defendant's offense level by two for obstruction of justice was not clearly erroneous.

## III.   Conclusion

For the foregoing reasons, we AFFIRM the defendant's conviction and sentence.